UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : No. 3:06CR171 (MRK) |
| | : |
| JAMES BOWERS | : |

**MEMORANDUM OF DECISION**

On June 14, 2006, a federal grand jury sitting in Hartford, Connecticut returned an indictment charging the Defendant James Bowers with being a previously convicted felon, who, on May 11, 2005, was in possession of a handgun, in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2). Indictment [doc. # 1]. Mr. Bowers' prior felony convictions were for possession of narcotics and assault in the second degree, both of which occurred in 2003. *Id.* On December 5, 2006, Mr. Bowers filed a Motion to Suppress Evidence [doc. # 29], seeking to suppress the firearm that is the subject matter of this prosecution. Both Mr. Bowers and the Government have filed several briefs regarding the suppression motion and the Court held two hearings on the motion, one on January 17, 2007 and a second on March 26, 2007. After considering the testimony and evidence, as well as the parties' briefs, the Court DENIES Mr. Bowers' Motion to Suppress Evidence [doc. # 29].

**I.**

The following facts were developed from the testimony and evidence presented at the two hearings. Further facts are recited in the legal discussion below.

Officer Chad Stringer, is a member of the New London, Connecticut Police Department, where he has worked for nearly 10 years. On Wednesday, May 11, 2005, at approximately 1:00 a.m.,

Officer Stringer was on patrol in uniform in a marked police cruiser (along with a Police Department canine in the rear seat of the cruiser) at the corner of Grand Street and Jefferson Avenue in New London, Connecticut. At the time, Officer Stringer was assigned to the 7:00 p.m to 3:00 a.m. shift. Officer Stringer's cruiser was stopped on Grand Street facing the intersection with Jefferson Avenue. That particular part of New London is a high crime area where gang activities, violence, and drug-dealing occur. It is also the home neighborhood of a local, active street gang active in the narcotics trade. Furthermore, at the intersection of Grand Street and Jefferson Avenue, there is a local bar that Officer Stringer described as a "continual headache" for local police, where there is often illicit activity. It was not unusual, therefore, for Officer Stringer to be in the area of the bar around its closing time.

While facing Jefferson Avenue, Officer Stringer saw a Pontiac Sunbird with a Rhode Island license plate pass in front of him and proceed down Jefferson Avenue. Jefferson Avenue is a two-lane, one-way street that runs through both residential and commercial areas of New London. Jefferson Avenue is very well-lit, with high intensity street lights. Officer Stringer decided to pull onto Jefferson Avenue and follow the Sunbird to see "what they were up to." He had never seen the Sunbird before. While following directly behind the Sunbird, Officer Stringer saw that the driver appeared to be a female, because of her hair, and that there was a passenger in the car. The Sunbird proceeded at an appropriate rate of speed, and Officer Stringer followed it down Jefferson Avenue to an intersection with Garfield and Lincoln Streets, which is a well-lit intersection. Officer Stringer did not recall if there were any other vehicles in the area at the time.

While following the Sunbird, Officer Stringer testified that he noticed that neither the driver nor the passenger were wearing their seatbelts, in violation of Connecticut law, Conn. Gen. Stat.

2

§ 14-100a. According to Officer Stringer, he could see through the rear window of the Sunbird that the seat belts and buckles were dangling down from the door sides of the car. After proceeding through the intersection and following the Sunbird for a short distance, Officer Stringer activated his emergency lights, and the Sunbird immediately pulled to a stop in front of 257 Jefferson Street, a residential portion of the City. Officer Stringer's cruiser was parked directly behind the Sunbird. Officer Stringer radioed in that he had stopped a car and intended to get out and approach the car. He then got out of his cruiser (leaving the canine lying on the back seat of the cruiser), approached the driver's side of the car, and confirmed that neither the driver nor the passenger had their seat belts buckled. Officer Stringer explained that he had pulled the Sunbird over because the driver and passenger were not wearing their seatbelts. Neither the driver nor the passenger protested when Officer Stringer said that they were not wearing their seat belts. Officer Stringer testified that if, after approaching the car, he had discovered that they were in fact wearing their seat belts, he would have said "have a good night" and would have told them they could leave.

  The driver was Theresa Harding, whom Officer Stringer estimated was in her late 30's or early 40's. Officer Stringer did not recognize her. However, from the driver's side, Officer Stringer immediately recognized the passenger as James Bowers, who was then approximately 19 years old. Officer Stringer knew that Mr. Bowers was a member of the local street gang and that he had a prior criminal record. They had previously encountered each other on many occasions–in fact, nearly weekly–while Officer Stringer was on patrol in the neighborhood. According to Officer Stringer, Mr. Bowers was always courteous and respectful to the officer, whom Mr. Bowers called "String," and they had an amicable relationship. Officer Stringer could not remember if he had ever arrested Mr. Bowers before. However, Officer Stringer did recall that previously he had asked Mr. Bowers

3

for consent to search him, that Mr. Bowers had given consent, and that he had searched Mr. Bowers.

Officer Stringer asked Ms. Harding for her driver's license, registration and insurance card, and she cooperated by gathering up her documentation. While she was doing that, Officer Stringer went over to the passenger side of the Sunbird to speak with Mr. Bowers. So far as Officer Stringer could recall, he had not yet determined whether the Sunbird's registration was valid (it was not) when he went over to speak with Mr. Bowers. At no time was the conversation between Officer Stringer and either of the occupants of the Sunbird either loud, animated, or hostile; Officer Stringer never drew his weapon or made any threats. Instead, the encounter was at all times calm and cordial.

When asked why he went over to speak with Mr. Bowers, Officer Stringer testified, "I knew him [Mr. Bowers] on a professional basis, figured I could get more of a story, more of what's going on from him." When he arrived at the passenger side of the Sunbird, Officer Stringer asked Mr. Bowers why he was there, and Mr. Bowers replied that Ms. Harding was a friend of his aunt's and was giving him a ride. Officer Stringer then asked both Ms. Harding and Mr. Bowers if either of them had any weapons or drugs. Both said they did not. He also asked them both if they would consent to a search, and both readily agreed to a search. Officer Stringer said he then asked Mr. Bowers a second time if he had any objection to the officer checking for weapons or drugs, and Mr. Bowers said, "Go ahead and check."

Officer Stringer explained that the reason he asked about drugs and weapons was because it was late at night in a high crime area known for drug dealing, the vehicle was from out-of-state and a "good number" of drug arrests in New London involve vehicles with out-of-state plates, and Mr. Bowers was a known member of the local street gang. He also testified that, had either Ms. Harding or Mr. Bowers declined to consent, he would not have detained them further and would

4

have sent them on their way. As he put it, "Most of the times I do ask for consent, if it's in the high crime area, most people do say no, and they're on their merry way."

Officer Stringer asked Mr. Bowers to step out of the car and had him walk to the rear of the Sunbird and place his hands on the trunk of the car. As Mr. Bowers got out of the Sunbird, he told the officer that he did not have anything on him. At or around this time, another New London police officer arrived at the scene and walked up to Officer Stringer and Mr. Bowers. According to Officer Stringer, another officer is always dispatched for officer safety when one officer indicates that he is approaching a vehicle late at night, regardless of the reason for the vehicle stop. While patting Mr. Bowers down, Officer Stringer felt what appeared to be the blunt end of a hand-gun. Officer Stringer alerted the other officer to this and then removed a .38 caliber Smith & Wesson revolver from Mr. Bowers' waistband. The handgun was loaded with four live rounds of hollow-point ammunition. Officer Stringer handcuffed Mr. Bowers and placed him in the cruiser. The officers then searched the Sunbird but found no drugs, weapons, or contraband in the vehicle. According to Officer Stringer, the entire encounter lasted only several minutes, certainly less than ten.

Mr. Bowers was charged by Officer Stringer with Possession of a Dangerous Weapon (Conn. Gen. Stat. § 53-206), Carrying a Pistol Without a Permit (Con.. Gen. Stat. § 29-35), and Criminal Possession of a Firearm (Conn. Gen. Stat. § 53a-217). He was also issued an infraction for Failure to Wear a Seat Belt (Conn. Gen. Stat. §14-100ac1). Ms. Harding was issued a motor vehicle summons for Failure to Wear a Seat Belt and Misuse of Plates (Conn. Gen. Stat. § 14-147c).

Officer Stringer testified at the suppression hearing, as well as New London Police Officer Keith Crandall and F.B.I. Special Agent Daniel Prather. Gary Fallon, a private investigator hired by Mr. Bowers, also testified. Neither Mr. Bowers nor Ms. Harding (whom Mr. Bowers could not

locate) testified at the suppression hearing.

## II.

Mr. Bowers seeks to suppress the handgun on the ground that it was seized without a warrant and in violation of the Fourth Amendment. He challenges the seizure of the weapon on two main grounds. First, he contends that there was no justification for stopping the Sunbird in the first place and that Officer Stringer's avowed purpose in stopping the vehicle–failure to wear seat belts–was pretextual. Second, Mr. Bowers argues that, even if there was a proper basis for stopping the Sunbird, Officer Stringer's investigation went beyond the proper bounds of such a stop, given the reason for pulling the car over, and that the consent to search that he obtained from Mr. Bowers was not knowing and voluntary.[1] The Government rejoins that the driver's and passenger's failure to wear their seat belts gave Officer Stringer a valid basis for stopping the Sunbird, that his investigation did not exceed proper bounds, and that Mr. Bowers knowingly and voluntarily consented to the search of his person that resulted in the discovery of the weapon.

### A.

The Second Circuit has succinctly summarized the standard governing police stops of vehicles as follows:

> The stop of a vehicle must be "reasonable" in the circumstances presented, and an officer making a stop must have a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause. In other words, an officer may not lawfully order someone to stop unless the officer reasonably suspects the person of being engaged in illegal activity.

---

[1] Mr. Bowers is African American, Ms. Harding is Caucasian, and Officer Stringer is Caucasian. No argument has been made, however, that race played any role in either Officer Stringer's decision to pull over Ms. Harding's vehicle or Mr. Bowers' consent to the search of his person.

*United States v. Jenkins*, 452 F.3d 207, 212 (2d Cir. 2006) (internal quotations and citations omitted). In reviewing "reasonable suspicion determinations, [courts] assess the totality of the circumstances supporting the investigatory stop." *United States v. Muhammad*, 463 F.3d 115, 121 (2d Cir. 2006).[2]

Mr. Bowers' argument regarding Officer Stringer's stop of the Sunbird boils down to the factual issue of whether Officer Stringer was, in fact, able to discern that Mr. Bowers and Ms. Harding were not wearing their seat belts, since Mr. Bowers appears to concede that if Officer Stringer did see that they were not wearing their seat belts, he had a proper basis to stop the Sunbird. On that issue, Mr. Bowers submitted the testimony of his investigator, Mr. Fallon, who stated that he had driven in the area of the stop at night and had been unable to determine from behind other vehicles whether the drivers or passengers were wearing their seatbelts. Mr. Fallon, an experienced police officer and investigator, submitted a videotape showing him following vehicles at night to support his assertion that it was not possible to see if the drivers or passengers were wearing their seat belts unless lights from another vehicle happened to illuminate the interior of the vehicle. That is, according to Mr. Fallon, the ambient lighting in the area as well as the headlights from the police cruiser would not, in and of themselves, have allowed Officer Stringer to see whether Ms. Harding and Mr. Bowers were wearing their seat belts, and Officer Stringer could not recall seeing any other cars in the vicinity that could have illuminated the interior of the Sunbird on the evening in question.

On this issue, the Government's evidence consisted of Officer Stringer's testimony that he

---

[2] The Court is aware that the Supreme Court currently has on its docket a case that asks whether a passenger can challenge a traffic stop as unconstitutional. *See Brendlin v. California*, No. 06-8120. For purposes of this case, the Court assumes, without deciding, that Mr. Bowers can challenge the legality of the original stop.

was able to see that Ms. Harding and Mr. Bowers were not wearing their seat belts, that he confirmed this fact when he went to the driver's side of the Sunbird, and that neither Ms. Harding nor Mr. Bowers ever claimed that they were wearing their seat belts. He also testified that it is his practice to stop vehicles when he sees that the driver or passengers are not wearing their seat belts unless he is doing something more important. The Government also points out that Officer Stringer charged Ms. Harding and Mr. Bowers with failing to wear their seat belts. The Government also relied on the testimony of Special Agent Prather and Officer Crandall, as well as photographs of the area taken by Officer Crandall and a video taken by Agent Prather and Officer Crandall while they were following vehicles at night in a police cruiser. Both Special Agent Prather and Officer Crandall testified that, as they followed cars at night, they were able to see when drivers and passengers were wearing their seat belts. In particular, they testified that they were able to see when a seat belt was not in use and was hanging down from the side of the vehicle.

The Court finds the testimony of Officer Stringer, Special Agent Prather, and Officer Crandall credible and corroborated by other evidence. Therefore, the Court finds as a fact that Officer Stringer was able to observe and did observe that Ms. Harding and Mr. Bowers were not wearing their seat belts in the early morning hours of May 11, that Officer Stringer had reasonable suspicion, if not probable cause, to believe that the operator and passenger of the Sunbird were committing motor vehicle violations, and that, therefore, Officer Stringer had a proper basis for stopping Ms. Harding's vehicle.

The Court reaches this conclusion for several reasons. First, the photographs of the area in question, combined with the testimony of the officers, attest to the fact that the area of New London where these events occurred is extremely well-lit, allowing observers to see into the interior of

8

vehicles. Second, the Court found credible the testimony of Special Agent Prather and Officer Crandall that in their experience in this area of New London, they could see into the interior compartment of vehicles at night and could determine whether a driver or passenger was wearing their seat belt. Not only did both officers attest that they had been able to make those determinations at night, but also the video they took demonstrates their point, since it shows them pulling next to a vehicle to confirm that the driver was not wearing a seat belt after the video showed that the driver was not wearing his seat belt. Moreover, one of the photographs taken at night by Officer Crandall shows that one can even see into the interior of a car from a distance because of the high intensity lighting in the area. *See* Government Ex. 7. Third, the Court found Officer Stringer, an experienced police officer, to be a credible witness. He did not hesitate, and his testimony was plausible, consistent, and forthright on both direct and cross-examination, and corroborated by other evidence. It was also unrebutted.. Fourth and finally, even Mr. Fallon admitted that on at least one occasion, he could see that a driver was not wearing his seat belt, and that is confirmed by his video. While at other points during Mr. Fallon's video it is difficult to determine whether a seat belt is being worn, his video–unlike Agent Prather's and Officer Crandall's–was taken on a rainy evening (it was clear and not raining on May 11) and was taken from the vantage point of an SUV, which sits much higher than the police cruiser that Officer Stringer was driving on May 11 and that Special Agent Prather and Officer Crandall used for their demonstration video. Also, Agent Prather and Officer Crandall both testified that they could determine whether a seat belt was being worn more readily and accurately with their naked eye than from the video.

    The Court does not doubt that a police officer could use a purported seatbelt violation as an excuse or pretext to pull a vehicle over where the driver and passenger, in reality, are not committing

9

any violation of the law. That is not this case, however. To the contrary, the Court finds that Officer Stringer's reason for pulling over the Sunbird was not pretextual and that he had at least reasonable suspicion, if not probable cause, for pulling the Sunbird over on May 11 because neither the driver nor the passenger were wearing their seat belts in violation of Connecticut law.[3] *See␣Whren␣v. United␣States*, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."); *Jenkins*, 452 F.3d at 212 (police justified in stopping vehicle when they reasonably (though mistakenly) believed that the automobile lacked license plates, in violation of motor vehicle laws). Accordingly, the stop of the Sunbird does not violate the Fourth Amendment.

**B.**

Mr. Bowers' next argument has two parts–first, that Officer Stringer's questioning and search of Mr. Bowers went impermissibly beyond the bounds of the original reason for pulling over the Sunbird–namely, to issue a traffic citation for failing to wear a seat belt; and second, that Mr. Bowers' consent to the search by Officer Stringer was not voluntary, but coerced. The Court disagrees with each argument.

As the Supreme Court has stated, "[m]ere police questioning does not constitute a seizure." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) ("[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions [or] by putting questions to him if the person is willing

---

[3] Mr. Bowers also suggests that Officer Stringer had no good reason for deciding to follow the Sunbird in the first place. However, merely following the Sunbird does not constitute a seizure. A seizure does not occur until someone's liberty is restrained in some manner. *See Terry v. Ohio*, 392 U.S. 1, 19 (1968)

to listen . . . ."); *see also California v. Hodari D.*, 499 U.S. 621, 626 (1991) ("The word 'seizure' . . . does not remotely apply . . . to the prospect of a policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee. That is no seizure."); *United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir. 1993) ("Detention, not questioning, is the evil at which *Terry*'s second prong is aimed"). Therefore, Mr. Bowers' first argument is that, by asking Mr. Bowers and Ms. Harding if they had any drugs or weapons in the car and for their consent to search the Sunbird, Officer Stringer unjustifiably and unnecessarily prolonged the detention of Mr. Bowers beyond the time needed to deal with the failure to wear seatbelts, in contravention of the Fourth Amendment. *See United States v. Sharpe*, 470 U.S. 675, 685 (1985) ("Obviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop."). Given the facts of this case, the Court does not believe that Officer Stringer's brief questioning of the occupants of the Sunbird was unreasonable. And it is reasonableness, after all, that is the "touchstone of the Fourth Amendment." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991); *see also Whren*, 517 U.S. at 809-10; *Koch v. Brattleboro*, 287 F.3d 162, 166 (2d Cir. 2002).

The Court assumes that any inquiry into reasonableness includes an assessment of both the scope and duration of a detention. But here, the duration of the detention was very brief–only several minutes and certainly less than ten. *See Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996) (asking a detained motorist whether he would consent to a search of his automobile for contraband, even after he had produced a valid driver's license, did not necessarily make the traffic stop unreasonable in scope or duration). Moreover, Officer Stringer's question about the presence of weapons or drugs was quite limited and, while different in scope from the offense that caused him to stop the vehicle in the first place, was nonetheless not intrusive and entirely reasonable under the circumstances. *See*

11

*United States v. Burton*, 334 F.3d 514, 518-19 (6th Cir. 2003) ("The record provides no reason to suspect either that these questions were unusually intrusive or that asking them made this traffic stop any more coercive than a typical traffic stop."). Officer Stringer had stopped an out-of-state vehicle late at night in a high crime area known for drug dealing and violence and in close vicinity of a club where illicit activity was known to occur. And Officer Stringer testified that he was aware of numerous drug deals in the same area involving out-of-state cars. *See United States v. Purcell*, 236 F.3d 1274, 1280 (11th Cir. 2001) ("Deputy Warren's question about guns or drugs was permissible. He had stopped a vehicle in a very high crime corridor, where armed drug couriers ply their trade daily."). Also, Officer Stringer knew that a passenger in the vehicle was a member of a local street gang active in the narcotics trade. The Court believes that Officer Stringer thus had objective and particularized facts that justified his suspicions about the situation he had encountered and that justified his brief inquiry into the presence of weapons or drugs. Finally, there were no threats of force by Officer Stringer, nor even any raised voices. Instead, the encounter was entirely cordial.

In the circumstances, therefore, it was not unreasonable for Officer Stringer, an experienced officer, to simply ask whether either the driver or passenger had drugs or weapons in their possession and whether they would consent to a search. As the Seventh Circuit observed in *United States v. Childs,* 277 F.3d 947 (7th Cir. 2002), "[q]uestions that hold potential for detecting crime, yet create little or no inconvenience, do not turn reasonable detention into unreasonable detention." *Id.* at 954; *see Jenkins*, 452 F.3d at 214 ("Because the officers did not act unreasonably in approaching the vehicle, and because an independent basis for investigation was immediately apparent, the officers did not violate the Fourth Amendment rights of the occupants by questioning them."); *United States v. Brigham*, 382 F.3d 500, 509 (5th Cir. 2004); *Burton*, 334 F.3d at 518-19. That is precisely the

12

circumstance presented here. Accordingly, Officer Stringer's brief inquiry of the occupants of the Sunbird and his request for consent to search did not offend the Constitution.

The Court is thus brought to the issue of Mr. Bowers' consent to the search. The Supreme Court long ago held that a police officer conducting a routine traffic stop may ask for consent to search the vehicle and its occupants. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Since Officer Stringer's testimony was credible and unrebutted, the Court finds that Mr. Bowers did give his consent to the search of his person that led to discovery of the weapon.[4]

However, a consensual search is constitutional only if it is voluntary and does not result from duress or coercion–that is, if it is an "essentially free and unconstrained choice." *Id.* at 225; *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993) (consent must be the product of free choice). "The Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force." *Schneckloth*, 412 U.S. at 228; *see United States v. Snype*, 441 F.3d 119, 130-31 (2d Cir. 2006). The Supreme Court also teaches that the Government has the burden of showing that the consent has been voluntarily given, "a question of fact to be determined from the totality of all the circumstances." *Schneckloth,* 412 U.S. at 249. In evaluating the totality of circumstances, a court may consider, among other factors, the nature and circumstances of the encounter, its duration, whether the police engaged in any coercive tactics or a show of force, any

---

[4] Mr. Bowers invokes Conn. Gen Stat. § 54-33m, which states that the failure of an operator or passenger of a vehicle to wear their seat belt "shall not constitute probable cause for a law enforcement official to conduct a search of such vehicle and its contents." That statute is irrelevant to this case because Officer Stringer did not seek to justify his search based on the seatbelt violation. Instead, he justified it on the basis of Mr. Bowers' voluntary consent. Mr. Bowers also cites to cases construing the Connecticut Constitution. But some of those decisions expressly state that they interpret the Connecticut Constitution to provide "enhanced rights" beyond those provided by the Fourth Amendment, as construed by the United States Supreme Court. *See, e.g., State v. Dalzell*, 96 Conn. App. 515, 531-32 (App. Ct. 2006).

language barrier between the defendant and the police, and his awareness of his right to refuse consent, though no one factor is determinative. *See, e.g., Snype*, 441 F.3d at 131; *United States v. Isiofa*, 370 F.3d 226, 231-32 (2d Cir. 2004); *see also Schneckloth*, 412 U.S. at 248-49 ("[W]hile the subject's knowledge of a right to refuse is one factor to be taken into account, the government need not establish such knowledge as a prerequisite to establishing a voluntary consent.").

Considering all of the facts and factors, the Court concludes that Mr. Bowers' consent was voluntary and not coerced, either explicitly or implicitly. In reaching that conclusion, the Court relies on the following facts. Mr. Bowers knew Officer Stringer, had seen him on numerous occasions and had a good relationship with him. Consistent with their prior encounters, their conversation on the evening of May 11, 2005 was low-key and cordial. While Mr. Bowers was then only 19, he already had considerable experience with the criminal justice system, having incurred two felony convictions in 2003, and therefore is assumed to have been aware, at least generally, of his rights.

Officer Stringer showed no force and made no threats; instead, he merely asked about the presence of weapons and drugs, giving Mr. Bowers an opportunity to remain silent or decline to participate in the search. Had Mr. Bowers declined to allow a search–which was not uncommon for Officer Stringer–the officer would have sent Ms. Harding and Mr. Bowers on their way. Instead, Mr. Bowers said "Go ahead and check." Unless the Court is prepared to conclude that any late night encounter with the police is so inherently coercive that no consent to a search can ever be voluntary–and the Court is not–the circumstances of this brief and entirely civil and reasonable encounter persuade the Court that Mr. Bowers' consent was freely given and voluntary. *See Purcell*, 236 F.3d at 1280.

**III.**

Accordingly, the Court DENIES Mr. Bowers' Motion to Suppress Evidence [doc. # 29].

IT IS SO ORDERED,

/s/      Mark R. Kravitz
United States District Judge

Dated at New Haven, Connecticut: **June 4, 2007.**